**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
**- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -**

**CHRISTOPHER MILLER,**

        **Plaintiff,**

  **v.**             **3:10-cv-597**

**CITY OF ITHACA, et al.,**

        **Defendants.**

**- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -**

THOMAS J. McAVOY
Senior United States District Judge

## DECISION and ORDER

Plaintiff Christopher Miller commenced the instant action asserting that he was discriminated against in connection with his employment on account of his race and gender and that he was retaliated against for engaging in protected activity. Miller asserts claims pursuant to Title VII of the Civil Rights Act of 1964, as amended; 42 U.S.C. §§ 1981 and 1983; the New York State Human Rights Law ("HRL"); and the New York State Constitution.[1] Presently before the Court is Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56, seeking dismissal of the Complaint in its entirety.

**I.**  **FACTS**

On October 5, 1999, Plaintiff Christopher Miller applied to be a police officer with the City of Ithaca Police Department ("IPD"). In his application, Miller claimed that he was never "dismissed or discharged from any employment for reasons other than lack of work or

---

[1] Many of Plaintiff's claims were dismissed pursuant to the Court's prior orders, familiarity with which is presumed.

funds" and that he never "resign[ed] from any employment rather than face dismissal."  Saul

Decl. at Ex. A.  Unbeknownst to Defendants at the time, the application failed to identify two

prior employers.  One of the prior employers, the Town of Vinton, Virginia Police Department,

recommended that Plaintiff be discharged from his employment due to various incidents

involving "his job performance and with f[o]llowing directions from supervisors."  Def. Ex. L.[2]

Plaintiff apparently told Defendants that he was unable to get a job as a police officer in

Virginia.  Plaintiff also was employed at Cargill, Inc.  While at Cargill, Plaintiff was suspended

for putting grease on the phone used to communicate with individuals in the mine.  Def. Ex.

G.  Shortly thereafter, Plaintiff's employment with Cargill was terminated for putting

something in another employee's locker.  Id.[3]

On September 7, 2000, Plaintiff commenced working for the IPD and attended the

Broome County Police Academy.  During that period of time, Plaintiff wrote an

autobiography.  Among other things, the Plaintiff wrote that, when he moved to Virginia, he

"stayed out of law enforcement altogether," and "no one would hire me in Virginia as a cop. .

. ."[4]

The IPD provided mandatory training to all officers.  It also offered additional,

optional, non-mandatory training.  In determining whether to provide optional training, the IPD

---

[2] Plaintiff contends that he voluntarily left employment in Vinton.

[3] Because these omissions from Plaintiff's employment application were not known by
Defendants until after the employment actions at issue in this case, they are not relevant to the issues of
discrimination or retaliation.  Vichare v. AMBAC, Inc., 106 F.3d 457, 467-68 (2d Cir. 1996).  This
information may be used, however, to limit any damages.  Id.  (such evidence "may render the employee
ineligible for front-pay and reinstatement and limit back pay to the period between the unlawful
termination and the date on which the discovery was made.").

[4] Based on his employment with the Vinton Police Department, Defendants contend that
Plaintiff's statements in his autobiography are false.

made decisions based on operational needs and budgetary considerations.  Other factors

included seniority, staffing needs, overtime expenditures, and whether the proposed training

was relevant to the officer's particular assignment.  To request training, an officer completes

a training request form.  The completed form is submitted to the staff officer for endorsement

(or refusal of endorsement).  The form is then sent to the training officer, where it is reviewed

by the training coordinator or assistant training coordinator for approval or denial.  Any

requests that make it past this stage are presented to the Professional Standards

Committee, comprised of the Chief of Police and Deputy Chiefs, with input from the training

coordinator and/or assistant training coordinator, which makes a final determination.

During his employment with the IPD, Plaintiff applied for nearly every training

opportunity offered.  Although not approved for every training for which he applied, Plaintiff

participated in many training courses.  Plaintiff claims that he was denied certain training

opportunities on account of his race and in retaliation for having complained about

discrimination.

In September 2004, the IPD Chief of Police determined that there was probable

cause to believe that Plaintiff "commit[ted] the crime of criminal mischief against the residents

of the area of the City known as the 'Jungle' by damaging their personal property."  The Chief

of Police sought to terminate Plaintiff's employment as a result of this incident.  In

satisfaction of the charges, Plaintiff agreed to a four week suspension and forfeiture of five

days of leave time.[5]

---

[5] This matter is referred to by the parties as the "Jungle incident."

In 2007, Plaintiff applied for, but was not promoted to, a position as a sergeant. Plaintiff obtained the top score on the relevant civil service examination.  Defendants contend that, nonetheless, there were better qualified officers and that Plaintiff had character issues that precluded him from being promoted.  Plaintiff, on the hand, contends that the then Chief of Police told Plaintiff that she had to promote minorities.  Defendants deny that any such statement was made.

On April 26, 2008, Plaintiff issued a bail receipt for $100 after receiving only $80 in bail money.  As a result, a letter of reprimand was placed in Plaintiff's file.  On August 4, 2008, Plaintiff filed a charge of discrimination with the New York State Division of Human Rights ("NYSDHR") against the IPD claiming that he was disciplined for various infractions and that other officers were not, that he was denied a promotion, that he was passed over for training opportunities, that he was being retaliated against, and that minorities received preferential treatment.

On September 19, 2008, Plaintiff was assigned to desk duty.  Plaintiff contends that this was on account of gender-based discrimination and in retaliation for his complaints of discrimination.  Defendants assert that the assignment was a result of staffing coverage needs and the fact that Plaintiff was working overtime, rather than his regular shift.

On May 13, 2009, Plaintiff was assigned to a STOP DWI shift.  Following the shift, Plaintiff wrote down the license plates of four vehicles he claimed to have stopped during the shift.  An investigation suggested that Plaintiff did not stop the cars he claimed to have stopped.  As a result, Plaintiff was issued a notice of discipline and received certain

sanctions.[6]  In addition, the District Attorney, who had been made aware of the STOP DWI

allegations, made a determination that Plaintiff had credibility issues that would have to be

disclosed to criminal defendants and, therefore, Plaintiff could not be used as a prosecution

witness.

In July 2009, Plaintiff filed another charge of discrimination with the NYSDHR.  For

the month prior to July 20, 2009, Plaintiff had been assigned various beats, including central

car beats, backup/traffic beats, and walking beats.  In July and August 2009, Plaintiff was

assigned to beat 204,[7] rather than his favored 203c beat, which covers the "flats," an area of

Ithaca in which the poorer population is centered and has a higher crime rate.  Plaintiff claims

that the beat assignments were in retaliation for his charge of discrimination.  Defendants, on

the other hand, claim that Lieutenant Byrd received a community complaint concerning

Plaintiff's conduct from a member of the Ithaca minority community and that it was the third

complaint about Plaintiff in a one year period.  Defendants also purport to have been

concerned with Plaintiff's following of protocol while he on the Commons beat (Beat 207).

Defendants allege that Byrd became concerned that Plaintiff was not acting professionally

towards minority citizens of the community and was not following protocol and, therefore,

assigned him to beats where he would have lessened interaction with minorities and be

subjected to closer supervision.

After July 20, 2009, Plaintiff worked for approximately four weeks when he went on

administrative leave.  Plaintiff remained on administrative leave from August 2009 through

---

[6] Plaintiff claims that he was threatened with criminal charges and termination if he did not accept the proposed penalty within twenty-four hours.

[7] Beat 204 is a car assignment covering the East Hill of Ithaca, including Cornell University and the area known as Collegetown.  This Beat apparently is one of the more preferred beats.

December 2009.  By letter dated September 22, 2009, the Tompkins County District Attorney

wrote a letter to Defendant Chief Vallely stating, in part, that:

> The findings made in relation to the disciplinary proceeding into Officer Chris
> Miller's performance of certain duties has created a problem regarding his value as
> a witness in any pending or future hearings or trials.
>
> It is my opinion that Officer Miller's credibility with respect to the accuracy/veracity
> of his paperwork has been irreparably damaged.  I am unwilling to put him on the
> witness stand under and foreseeable circumstances owing to significant *Brady* and
> *Giglio* issues. . . .
>
> Upon his return from administrative leave, Defendants placed Plaintiff on

permanent desk duty, purportedly because his value as a police officer had been

undermined by the letter from the District Attorney.

In the spring of 2010, Defendants learned that Plaintiff had previously been

employed as a police officer with the Vinton, Virginia police department.  In April 2010,

Defendant Deputy Chief Barber obtained a copy of Plaintiff's autobiography, previously

discussed *supra*, in which Plaintiff wrote that "no one would hire him in Virginia as a cop."  In

May 2010, Defendants learned that Plaintiff was "terminated during his probationary period"

from his position with the Vinton Police Department "for failure to perform up to standards of

a police officer. . . ."  The letter from the Vinton Police Department listed various reasons

supporting the termination, including: counseling for failure to follow written directives, failing

to follow established procedures, and failing to follow verbal directions; failing to have a state

inspection sticker on his personal vehicle; and his "admission to taking the sunglasses of a

police officer and scratching "Im A Dick" on the lenses because he did not like the officer."

On May 20, 2010, Plaintiff commenced the instant litigation.  On May 26 or 27,

Defendant Vallely asked Defendant Barber to draft a notice of discipline based on Plaintiff's

falsification of his employment application and to seek the termination of Plaintiff's employment.  In the early to mid afternoon of May 27, 2010, Barber sent to Vallely a draft notice of discipline seeking the termination of Plaintiff's employment.  Vallely made one final edit of the notice of discipline and otherwise approved the draft.  By 5:00 p.m., both Vallely and Barber had left work for the day.  At 5:30 p.m on May 27, 2010, Plaintiff served a copy of the Complaint in this lawsuit on the IPD.  The notice of discipline was served on Plaintiff on June 1, 2010.  Plaintiff demanded arbitration in connection with the notice of discipline, which is pending.  Plaintiff is receiving pay during the arbitration proceeding.

Presently before the Court is Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56 seeking dismissal of the Complaint in its entirety.  Plaintiff opposes the motion.  Defendants have submitted a reply.

## II.      STANDARD OF REVIEW

Defendants move for summary judgment pursuant to Rule 56.  It is well settled that, on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, see Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant is able to establish a prima facie basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation.  Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).

With these standards in mind, the Court will address the pending motion.

## III.    DISCUSSION

### a.    Race Discrimination

Defendants move to dismiss Plaintiff's claims that he was discriminated against on account of his race.  Plaintiff asserts that he was discriminated against on account of his race in the denial of certain training opportunities and in the failure to promote him to the position of sergeant.  To succeed on a race discrimination claim, Plaintiff must demonstrate that he suffered an adverse employment action under circumstances giving rise to an inference of discrimination on account of race.  Feingold v. New York, 366 F.3d 138, 149 (2d Cir. 2004). Thus, Plaintiff must show that: (1) he belonged to a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent.  Brown v. City of Syracuse, 673 F.3d 141, 150 (2d Cir. 2012).  To establish a prima facie case for discriminatory failure to promote, Plaintiff must demonstrate

that: (1) he is a member of a protected class; (2) he applied for promotion to a position for which he was qualified; (3) he was rejected for the position; and (4) the employer kept the position open and continued to seek applicants.  Mauro v. S. New England Telecommunications, Inc., 208 F.3d 384, 386 (2d Cir. 2000).  With respect to the failure to promote claim, being qualified refers to the criteria the employer has specified for the position.  Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 127 (2d Cir. 2004).

### 1.    Failure to Train

Plaintiff claims that he was denied various training opportunities on account of his race.  Defendants move to dismiss this claim on the ground that Plaintiff is unable to demonstrate that he suffered any adverse employment consequences as a result of any claimed failure to train.

"'A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment. . . .  An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities.'"  Brown, 673 F.3d at 150 (quoting Josseph v. Leavitt, 465 F.3d 87, 90 (2d Cir. 2006)).  Trivial harms (i.e. pettty slights or minor annoyances) are not materially adverse.  Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 568 (2d Cir. 2011).  "Denial of training can constitute an adverse employment action where it 'bear[s] on either plaintiff's opportunities for professional growth and career advancement or directly on plaintiff's compensation.'"  Hill v. Rayboy-Brauestein, 467 F. Supp. 2d 336, 352 (S.D.N.Y. 2006) (quoting Nakis v. Potter, No. 01 Civ. 10047, 2004 WL 2903718, at *20 (S.D.N.Y. Dec.15, 2004)).  "When an employee cannot show material harm from a denial of training, such as a failure to promote or a loss of career advancement opportunities, there is no

adverse employment action." Hill, 467 F. Supp.2d at 352; see also Clay v. United Parcel

Service, Inc., 501 F.3d 695, 701 (6th Cir. 2007) (a deprivation of increased compensation as

the result of a failure to train constitutes an adverse employment action); Shackelford v.

Deloitte & Touche, LLP, 190 F.3d 398, 406-07 (5th Cir. 1999) (a denial of training is not an

adverse employment action where it does not tend to result in a change of employment

status, benefits or responsibilities); Ikewood v. Xerox Corp., (W.D.N.Y. 2011) (a plaintiff's

"dissatisfaction with the level of training she receives [is not] . . . an adverse employment

action."); Santiago v. City of New York, 2009 WL 935720, at *9 (E.D.N.Y. 2009).

      Here, there is evidence that Plaintiff applied for nearly every training opportunity

offered.  The undisputed evidence is that Plaintiff was provided with all mandatory training

opportunities.  Def.'s Stmnt. of Mat. Facts at ¶ 16.  In opposition to Defendants' motion,

Plaintiff has submitted insufficient evidence to demonstrate how the denial of any of the other

optional training opportunities (including those identified in his affidavit) negatively impacted

his job performance, his eligibility for promotion, or his pay and/or benefits.  In fact, in his

responsive memorandum of law, Plaintiff does not address how the denial of these training

opportunities materially affected the terms and conditions of his employment.  The mere fact

that Plaintiff would have liked to attend additional training courses standing alone is

insufficient to constitute an adverse employment action.  Accordingly, the claims alleging

failure to train on account of race must be dismissed.  For this same reason, Plaintiff's claim

that he was denied the opportunity to attend breathalyzer training in retaliation for

complaining of unlawful discrimination also must be dismissed.  See discussion *infra*.

### 2.    Failure to Promote

Plaintiff contends that he was not promoted to the position of sergeant on account of his race.  In support, he claims that he had a good record, he was qualified for the position, and he scored well on the examination, but then-Chief Signer stated he did not get the job because she had to promote minorities

Defendants move to dismiss this claiming that, although Plaintiff scored well on the sergeant's civil service examination, he was not otherwise qualified for the position because examination success does not reflect on other relevant considerations, including character. Defendants contend that Plaintiff had many issues including the Jungle incident and having various complaints against him for bullying behavior[8] that precluded him from obtaining the sergeant position.  Defendants further note that the New York Civil Service law does not require them to choose the candidate with the highest score on the civil service exam, but only that the selection be from one of the three highest scoring persons.  In addition, Defendants argue that the other two high scoring officers, Garin and Navarro, were more qualified than Plaintiff because Garin had been deeply involved with the IPD (including participation in various committees and voluntary participation in IPD recruitment efforts) and Navarro had impressed the Chief in his handling of a then-recent murder investigation (in which he is claimed to have demonstrated good investigative and community relation skills) and his assistance in recruitment.  Lastly, Defendants note that, during Signer's tenure as Chief, there were thirteen promotions, nine of which were of White officers.

The facts strongly suggest that Defendants had legitimate, non-discriminatory reasons for not promoting Plaintiff to the position of sergeant.  There also are many facts

---

[8] In his responsive statement of material facts, Plaintiff does not properly dispute that there were complaints against him that were part of the reason he was not promoted to sergeant in 2007.  Pl.'s Rule 7.1(a) stmnt. at ¶ 52.  Accordingly, these facts are deemed admitted.

casting substantial doubt on Plaintiff's veracity, including whether Chief Signer told Plaintiff that she had to hire minorities (particularly in light of the statistical evidence, Plaintiff's previous complaints of discrimination against the IPD, and the other evidence concerning Plaintiff's qualifications to be Sergeant).   That being said, if Signer made such a statement, it would permit the trier of fact to reasonably conclude that race was a factor in her decision not to promote Plaintiff.   Whether Signer stated that she had to promote minorities is a credibility determination inappropriate for resolution on a motion for summary judgment.   Jeffrys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005) ("'Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.'") (quoting Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996)).[9] Accordingly, Defendants' motion to dismiss this claim must be DENIED.

> **b.      Retaliation**

Defendants also move to dismiss Plaintiff's retaliation claims.   Plaintiff claims that he was retaliated against for making complaints of discrimination and/or retaliation and for engaging in speech protected by the First Amendment.

Title VII prohibits an employer from taking materially adverse action against an employee because the employee opposed conduct that Title VII forbids or the employee otherwise engaged in protected activity.   Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 567 (2d Cir. 2011).   Whether something is "materially adverse" entails an objective determination of whether the employer's action might have dissuaded a reasonable

---

[9] Although Plaintiff suffers from significant credibility issues, the statement he attributes to Signer, while questionable, is not sufficiently inconsistent or blatantly contradicted by the record to permit the Court to find it to be incredible as a matter of law.  Scott v. Harris, 127 S. Ct. 1769, 1776 (2007).

employee from making or supporting a charge of discrimination.  Id.  "Actions that are 'trivial harms' -"i.e., 'those petty slights or minor annoyances that often take place at work and that all employees experience" - are not materially adverse."  Id. (quoting Burlington N. & Santa Fe Ry. Co. v. White, 126 S. Ct. 2405, 2415 (2006).   "Context matters, as some actions may take on more or less significance depending on the context."  Id.  "Alleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct."  Id.

With these standards in mind, the Court will address the claimed instances of retaliation.

### 1.   Breathalyzer Training

Plaintiff contends that he was denied breathalyser training in retaliation for complaining of discrimination.  As discussed supra, Plaintiff has made an insufficient showing that the denial of any such training constituted an adverse action or would dissuade a reasonable worker from making or supporting a charge of discrimination.  Further, Plaintiff has presented insufficient evidence from which it reasonably may be inferred that the denial of this training was causally related to any protected activity.  Even considered as part of a larger course of conduct in connection with the other claimed instances of retaliation discussed infra, this claim must be DISMISSED.

### 2.   Assignment to Desk Duty

Plaintiff also alleges that he was assigned to desk duty on September 19, 2008 in retaliation for filing a second charge of discrimination with the New York State Division of Human Rights.  The temporal proximity between the filing of a complaint with the NYSDHR in August 2008 and the September 2008 desk duty assignment is sufficient to satisfy Plaintiff's

de minimis burden of establishing a prima facie case of retaliation.[10]  Defendants move to

dismiss this claim on the ground that the decision was made for a legitimate, non-

discriminatory reason; namely, that the decision was made entirely based on staffing needs

and that the decision-maker, Sergeant Garrin, was not aware that Plaintiff had filed a

complaint with the NYSDHR the previous month.  In particular, Defendants allege that, on the

date in issue, Plaintiff was working an overtime shift (which shifts are scheduled in four hour

increments), Plaintiff was the last officer to sign up for overtime, and he was the only officer

available to work the desk shift for the full four hour period.  Moreover, Sergeant Garrin, who

made the decision to assign Plaintiff to desk duty, states that "while [he] was generally aware

that [Plaintiff] had filed complaints with the Division of Human Rights in the past, [he] had no

knowledge that [Plaintiff] had recently filed a new complaint. . . . I did not learn about that

until much later."  This adequately constitutes a legitimate, non-discriminatory reason with the

familiar McDonnell Douglas burden shifting paradigm.  Accordingly, the burden reverts to

Plaintiff to demonstrate that retaliation was a factor in the decision to place Plaintiff on desk

duty.

      Plaintiff has failed to satisfy his burden.  Plaintiff makes no mention of the desk

duty assignment in his responsive memorandum of law, thereby indicating his consent to the

dismissal of this claim.  Zuk v. Onondaga County, 2011 WL 4344043, at *4 (N.D.N.Y. 2011).

---

[10] Under the well-settled procedure set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), the first step is to inquire whether Plaintiff has successfully asserted a prima facie case of retaliation against the Defendants.  The burden at this step is minimal.  If Plaintiff satisfies this burden, Defendants have the burden of showing a legitimate, non-discriminatory reason for its action(s).  If Defendants meet this burden, any presumption of retaliation is eliminated and Plaintiff then has the opportunity to show that Defendant's reasons were a pretext for unlawful retaliation or otherwise adduce sufficient evidence of retaliation to permit a finder of fact to reasonably conclude that the adverse action was more probably than not motivated, at least in part, by retaliation.  Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 123 (2d Cir. 2004).

Further, his responsive statement of material facts fails to properly challenge Defendants'

statement of material facts, see Stmnt. of Mat. Facts at ¶ 60,[11] or otherwise create a triable

issue of fact that he was placed on desk duty in retaliation for complaining of discrimination.

"[R]eassignment of job duties is not automatically actionable." Burlington N. &

Santa Fe Ry. Co., 126 S. Ct. at 2417.  The standard for assessing such a reassignment is an

objective one.  See id. at 2415.  Whether a particular reassignment is materially adverse

depends upon the circumstances of the particular case, and should be judged from the

perspective of a reasonable person in the plaintiff's position, considering all the

circumstances.  Id. at 2417; see also Kessler v. Westchester County Dept. of Soc. Servs.,

461 F.3d 199, 209 (2d Cir. 2006).  Because there is insufficient evidence that the one-time

assignment to desk duty for a four hour shift would dissuade a reasonable person from

complaining or supporting a charge of discrimination or was made because Plaintiff filed a

charge of discrimination, the claim must be dismissed.

### 3.  **Beat Assignments**

Plaintiff's next claim is that he was assigned a walking beat in retaliation for his

complaints of discrimination and retaliation.  Defendants respond that Plaintiff was assigned

to the walking beat because of a history of disciplinary concerns about his behavior towards

African-American residents and his failure to follow protocol.

There is a triable issue of fact whether the beat assignments constitute a

sufficiently adverse action.  On the one hand, it is not clear whether Plaintiff was assigned to

walking beats, the Commons beat, or the Collegetown beats more frequently than other

---

[11] Plaintiff's responses to the material assertions are not supported by citations to the record.

similarly situated Officers.  Further, Lieutenant Byrd (who assigned the beats) had a long-standing practice to rotate all Officers through a variety of shift assignments.  On the other hand, it is unknown to what extent Byrd rotated assignments and Byrd states in his affidavit that he changed Plaintiff's beat assignment to the Commons and Collegetown beats due to concerns about his behavior so he could be more closely supervised.  Moreover, Plaintiff and Officer Brotherton state in their affidavits that walking beats are considered undesireable and are mostly for junior officers or an officer in trouble with the administration.  These facts could reasonable be interpreted to suggest that these assignments were punitive or might otherwise be viewed by reasonable officers as undesirable and, therefore, could dissuade a reasonable person from engaging in protected activity.

There similarly is a triable issue of fact whether the change in assignments was on account of Plaintiff's protected activity.  The change in assignments occurred close in time to Plaintiff's July 2009 charge of discrimination.  Although Byrd offers some legitimate, non-discriminatory reasons for the change in beat assignments (community complaints about Plaintiff, his failure to follow protocol in connection with the Commons beat, etc.), it appears that Sergeant Navarro also had input into Plaintiff's duties.  Navarro Dep. at 83.[12]  There is evidence in the record that Navarro was upset over Plaintiff's July 2009 charge of discrimination because he believed it contain untrue statements about him.  This caused Navarro to post a copy of Plaintiff's charge of discrimination on the IPD bulletin board. Looking at this evidence in the light most favorable to the non-movant, a fair minded trier of

---

[12] The extent to which Sgt. Navarro had input into the specific beat assignments at issue here is unclear from the record.

fact could reasonably conclude that Navarro had input into Plaintiff's beat assignments and acted because of the statements in the charge of discrimination.

### 4.   Notice of Dismissal

The next issue is whether the notice of dismissal issued on May 27, 2010 was in retaliation for Plaintiff's complaints of discrimination.  Defendants move to dismiss this claim on the ground that the notice of dismissal was issued seven months after Plaintiff filed his August 2009 charge of discrimination (and many years after he first started filing charges of discrimination), and that it was issued because Plaintiff was found to have failed to disclose prior jobs on his employment application with the IPD.  This satisfies Defendant's burden in the McDonnell Douglas analysis, thereby placing the burden back on Plaintiff to demonstrate sufficient evidence from which a fair minded trier of fact could reasonably conclude that Defendants were motivated, at least in part, by retaliation.

In response, Plaintiff refers to a tape-recorded conversation between Plaintiff, Barber, Tyler and Vallely that occurred within approximately one month of the issuance of the notice of discipline.  Although most of the conversation relates to statements Plaintiff was alleged to be making to other officers while working the desk and to the source of certain blogs that were critical of the IPD, there are references to Plaintiff's Human Rights Complaints.  At one point during the conversation, Tyler states, in part, that:

> if you want to really open up a can of worm, that some of the stuff, . . . actually
> most if not all the stuff you're alleging about me in the Human Rights Complaints,
> are completely [sic] and utter lies. . . .

Other parts of the conversation relate to discussions whether Plaintiff was unhappy at the IPD and whether he should find other employment.  Based on the foregoing, and looking at

the evidence in the light most favorable to Plaintiff, the trier of fact could reasonably conclude that the notice of discipline was issued, in part, because of the charge of discrimination.

On the other hand, there is insufficient evidence that the notice of discipline was issued in retaliation for the filing of the instant lawsuit. The undisputed evidence is that Vallely asked Barber to draft a notice of discipline on May 26 or 27.[13] That notice sought Plaintiff's termination. Defendants Barber and Vallely had left work no later than 5:00 p.m. on May 27. Plaintiff served a copy of the Complaint in this action on the IPD at 5:30 p.m. on May 27, 2010. Inasmuch as the notice was drafted before Defendants were aware of the lawsuit, the notice of termination could not have been issued in retaliation therefor. Accordingly, summary judgment is denied as to the claim of retaliation in connection with the charge of discrimination and granted as to the claim of retaliation in connection with the filing of the instant lawsuit.

**5.    First Amendment**

Defendants next move to dismiss Plaintiff's First Amendment claim on the grounds that: (1) he did not engage in protected speech; and (2) assuming the speech is protected, he would have been subjected to the same adverse employment actions even absent his speech.

"Whether an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record." Ruotolo v. City of New York, 514 F.3d 184, 189 (2d Cir. 2008) (citations and quotations omitted). The speaker's motive, while not dispositive,

---

[13] See Def.'s Stmnt. of Mat. Facts at ¶¶ 96-97. In response, Plaintiff does not cite to any record evidence showing that the decision was made at a time after May 26 or 27th.

is a relevant consideration.  <u>Sousa v. Roque</u>, 578 F.3d 164, 175 (2d Cir. 2009).  "The heart of the matter is whether the employee's speech was 'calculated to redress personal grievances or whether it had a broader public purpose.'"  <u>Ruotolo</u>, 514 F.3d at 189 (quoting <u>Lewis v. Cohen</u>, 165 F.3d 154, 163-64 (2d Cir. 1999)).  "[S]peaking up on a topic that may be deemed one of public importance does not automatically mean the employee's statements address a matter of public concern as that term is employed in <u>Connick</u>."  <u>Kokkinis v. Ivkovich</u>, 185 F.3d 840, 844 (7th Cir. 1999).

The Court has reviewed the 2008 and 2009 charges of discrimination filed by Plaintiff.  Overall, Plaintiff's complaints were about his own treatment and his situation at the IPD.  Although Plaintiff makes numerous reference to instances involving other officers, it appears that the reasons for this are primarily to show that he, personally, was singled out and treated unfavorably, thereby substantiating his claim that he was discriminated against on account of his race and gender and/or that he was retaliated against for making such complaints.  That being said, the charges of discrimination do make reference to instances of department wide racial discrimination and misconduct by officers that was tolerated by the IPD without investigation or appropriate response.  This could constitute protected speech. The Court will reserve decision on this issue until after hearing the proof at trial.

Assuming, *arguendo*, that Plaintiff's speech is protected, for the reasons discussed *supra* in connection with the Title VII retaliation claims, questions of fact remain whether the change in Plaintiff's beat assignments and his termination were in retaliation for his speech

and whether Defendants would have undertaken the same adverse employment actions[14] in the absence of the speech.

> ### c.        Personal Involvement

Defendants move to dismiss the HRL and § 1983 claims against Defendants Tyler, Byrd, Navarro, and Garin on the grounds that there is insufficient evidence of their involvement in any discriminatory or retaliatory conduct.  As discussed above, questions of fact remain whether Defendants Byrd and Navarro assigned Plaintiff to unfavorable beats on account of his speech and/or charges of discrimination.  The evidence is undisputed that Byrd was involved in assigning Plaintiff to these other beats.  A question of fact remains whether Navarro was involved in the decision to change Plaintiff's beat assignments.  Similarly, because there is some testimony to the effect that Defendant Tyler had "a part in" the notice of discipline seeking Plaintiff's termination, triable issues of fact remain concerning his personal involvement in the claims pertaining to the termination of Plaintiff's employment.

With respect to Defendant Garrin, the only allegations concerning him related to Plaintiff's assignment to desk duty on September 19, 2008.  As discussed above, Plaintiff failed to satisfy his burden of demonstrating that this assignment was in retaliation for engaging in protected conduct and/or speech.  Because this is the only incident alleged to have involved Defendant Garin, the Complaint is dismissed as to him.

---

[14] As previously noted, a triable issue of fact also remains whether the change in beat assignments constitute a sufficiently adverse employment action or would dissuade a reasonable person from complaining of discrimination or engaging in protected speech.

**d.      Qualified Immunity**

Defendants also claim entitlement to qualified immunity. It is well-settled that it is unlawful to discriminate against someone on account of their race and/or to retaliate against someone on account of engaging in protected speech and/or protected conduct. See e.g., Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 130 (2d Cir. 2004). If, in fact, Defendants engaged in unlawful discrimination or retaliation as alleged by Plaintiff, it could have been done with an intent that precludes application of qualified immunity. Id. ("it can never be objectively reasonable for a governmental official to act with the intent that is prohibited by law.") (quoting Locurto v. Safir, 264 F.3d 154, 169 (2d Cir. 2001)).

  Accordingly, the motion for summary judgment on this ground is DENIED.

**e.      Damages**

Lastly, Defendants seek dismissal of Plaintiff's claims for back pay, punitive damages, and other damages under the "after-acquired evidence" theory. It is undisputed that, during the pendency of the related arbitration involving Plaintiff and the City of Ithaca, Plaintiff has continued to be paid. Because Plaintiff has not suffered any loss of pay to date, any claims of back pay must be dismissed. It similarly is well-settled that punitive damages are not available against a municipality. Accordingly, the claim for punitive damages against the City of Ithaca is dismissed.

Defendants also contend that "Plaintiff would never had been hired had IPD known about his previous employment and discharge from the Vinton police department. Therefore, by the principle of 'after-acquired evidence,' [his] claims for damages of any kind are void." Defs.' Mem. of Law at 34. Under the after-acquired evidence doctrine, "[o]nce an employer learns about employee wrongdoing that would lead to a legitimate discharge, we cannot

require the employer to ignore the information, even if it is acquired during the course of

discovery in a suit against the employer and even if the information might have gone

undiscovered absent the suit."  McKennon v. Nashville Banner Pub. Co., 513 U.S. 352, 362,

115 S. Ct. 879, 886 (1995).  "Where an employer seeks to rely upon after-acquired evidence

of wrongdoing, it must first establish that the wrongdoing was of such severity that the

employee in fact would have been terminated on those grounds alone if the employer had

known of it at the time of the discharge."  Id. at 362-63.

Although such evidence cannot bar recovery entirely, here, it can serve to

substantially limit any recovery (including a bar on front pay and limiting back pay and

compensatory damages, see Cross v. Samper, 510 F. Supp.2d 59, 64 (D. D.C. 2007)), if it

can be shown that Defendants would have terminated Plaintiff's employment upon learning

of the omissions from his application.  Although Defendants uncovered evidence that Plaintiff

misrepresented his history of prior employment, and such conduct likely is sufficient to

sustain a dismissal for cause, there is a triable issue of fact whether the omission, alone,[15]

would have resulted in seeking the termination of Plaintiff's employment.  Although the prior

Chief of Police, Richard Basile, testified that, had he been aware of Plaintiff's prior work

history, he would not have recommended his hiring to the Mayor, we do not know what the

Mayor would have done with this information.  Further, there is an instance involving another

---

[15] By using the term "alone," the Court is not referring to other instances of misconduct that
Defendants may take into consideration in ascertaining a proper penalty for misconduct, but whether,
absent Plaintiff's engaging in protected conduct, the omissions from the employment application
(together with any past misconduct) would have resulted in seeking the termination of Plaintiff's
employment.

officer who omitted a prior employment from his application,[16] but was, nonetheless, employed by the IPD.  It, therefore, cannot be conclusively determined that Plaintiff would have been fired but for the omissions on his application.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.  The motion is granted insofar as the following claims are dismissed:

a.    discrimination in connection with the failure to train;

b.    retaliation in connection with the failure to train;

c.    retaliation in connection with the assignment to desk duty in September 2008;

d.    retaliation in connection with the filing of the instant lawsuit; and

e.    all claims against Defendant Garrin.

In all other respects, Defendants' motion is denied.

IT IS SO ORDERED.

Dated: June 1, 2012

Thomas J. McAvoy
Senior, U.S. District Judge

---

[16] The other officer apparently omitted a part-time job from when he was sixteen years old. Although this could be found to be substantially different from Plaintiff's failure to indicate two prior jobs whereby he was implicated in misconduct (one of which was with a police department), this is for a jury to decide.