**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
**- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -**

**CHRISTOPHER MILLER,**

                                        **Plaintiff,**

        **v.**                                          **3:10-cv-597**

**CITY OF ITHACA, et al.,**

                                        **Defendants.**

**- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -**

THOMAS J. McAVOY
Senior United States District Judge

## DECISION and ORDER

        Plaintiff Christopher Miller commenced the instant action asserting that he was

discriminated against in connection with his employment on account of his race and gender

and that he was retaliated against for engaging in protected activity. Miller asserted claims

pursuant to Title VII of the Civil Rights Act of 1964, as amended; 42 U.S.C. §§ 1981 and

1983; the New York State Human Rights Law ("HRL"); and the New York State Constitution.[1]

After a trial, a jury found that Plaintiff failed to satisfy his burden of proof on the discrimination

claims, but found that all Defendants except Andrew Navarro retaliated against Plaintiff for

engaging in protected activity.  Presently before the Court are Defendants' motions to stay

the judgment; for judgment as a matter of law or, alternatively, for a new trial; and attorneys'

fees; and Plaintiff's motions for attorneys' fees, costs, and for an altered judgment.

---

[1] Many of Plaintiff's claims were dismissed pursuant to the Court's prior orders, familiarity with
which is presumed.

In addressing the pending motions, the Court presumes familiarity with the prior motions in this case and the Court's Decisions and Orders relating to those motions.

## I.      FACTS

The basic facts are as follows.  On October 5, 1999, Plaintiff Christopher Miller applied to be a police officer with the City of Ithaca Police Department ("IPD").  In his application, Miller claimed that he was never "dismissed or discharged from any employment for reasons other than lack of work or funds" and that he never "resign[ed] from any employment rather than face dismissal."  Saul Decl. at Ex. A.  Unbeknownst to Defendants at the time, the application failed to identify two prior employers.  One of the prior employers, the Town of Vinton, Virginia Police Department, recommended that Plaintiff be discharged from his employment due to various incidents involving his job performance and with following directions from supervisors.[2]  Plaintiff told Defendants that he was unable to get a job as a police officer in Virginia.  Plaintiff also was employed at Cargill, Inc.  While at Cargill, Plaintiff was suspended for putting grease on the phone used to communicate with individuals in the mine.  Def. Ex. G.  Shortly thereafter, Plaintiff's employment with Cargill was terminated for putting something in another employee's locker.  Id.

On September 7, 2000, Plaintiff commenced working for the IPD and attended the Broome County Police Academy.  During that period of time, Plaintiff wrote an autobiography.  Among other things, the Plaintiff wrote that, when he moved to Virginia, he

---

[2] Plaintiff contended that he voluntarily left employment in Vinton.

"stayed out of law enforcement altogether," and "no one would hire me in Virginia as a cop. . . ."[3]

In September 2004, the IPD Chief of Police determined that there was probable cause to believe that Plaintiff "commit[ted] the crime of criminal mischief against the residents of the area of the City known as the 'Jungle' by damaging their personal property." The Chief of Police sought to terminate Plaintiff's employment as a result of this incident. In satisfaction of the charges, Plaintiff agreed to a four week suspension and forfeiture of five days of leave time.[4]

In 2007, Plaintiff applied for, but was not promoted to, a position as a sergeant. Plaintiff obtained the top score on the relevant civil service examination. Defendants contend that there were better qualified officers and that Plaintiff had character issues that precluded him from being promoted. Plaintiff, on the hand, contends that the then Chief of Police told Plaintiff that she had to promote minorities. Defendants denied that any such statement was made. These facts formed the basis of Plaintiff's discriminatory failure to promote theory, which the jury rejected.

On April 26, 2008, Plaintiff issued a bail receipt for $100 after receiving only $80 in bail money. As a result, a letter of reprimand was placed in Plaintiff's file. On August 4, 2008, Plaintiff filed a charge of discrimination with the New York State Division of Human Rights ("NYSDHR") against the IPD claiming that he was disciplined for various infractions and that other officers were not, that he was denied a promotion, that he was passed over for

---

[3] Based on his employment with the Vinton Police Department, Defendants contend that Plaintiff's statements in his autobiography are false.

[4] This matter is referred to by the parties as the "Jungle incident."

training opportunities, that he was being retaliated against, and that minorities received preferential treatment.

On September 19, 2008, Plaintiff was assigned to desk duty.  Plaintiff claimed that this was on account of gender-based discrimination and in retaliation for his complaints of discrimination.  Defendants assert that the assignment was a result of staffing coverage needs and the fact that Plaintiff was working overtime, rather than his regular shift.

On May 13, 2009, Plaintiff was assigned to a STOP DWI shift.  Following the shift, Plaintiff wrote down the license plates of four vehicles he claimed to have stopped during the shift.  An investigation suggested that Plaintiff did not stop the cars he claimed to have stopped.  As a result, Plaintiff was issued a notice of discipline and received certain sanctions.[5]  In addition, the District Attorney, who had been made aware of the STOP DWI allegations, made a determination that Plaintiff had credibility issues that would have to be disclosed to criminal defendants and, therefore, Plaintiff could not be used as a prosecution witness.

In July 2009, Plaintiff filed another charge of discrimination with the NYSDHR.  For the month prior to July 20, 2009, Plaintiff had been assigned various beats, including central car beats, backup/traffic beats, and walking beats.  In July and August 2009, Plaintiff was assigned to beat 204,[6] rather than his favored 203c beat, which covers the "flats," an area of Ithaca in which the poorer population is centered and has a higher crime rate.  Plaintiff claims that the beat assignments were in retaliation for his charge of discrimination.  Defendants, on

---

[5] Plaintiff claims that he was threatened with criminal charges and termination if he did not accept the proposed penalty within twenty-four hours.

[6] Beat 204 is a car assignment covering the East Hill of Ithaca, including Cornell University and the area known as Collegetown.  This Beat apparently is one of the more preferred beats.

the other hand, claim that Lieutenant Byrd received a community complaint concerning

Plaintiff's conduct from a member of the Ithaca minority community and that it was the third

complaint about Plaintiff in a one year period.  Defendants also purport to have been

concerned with Plaintiff's following of protocol while he was on the Commons beat (Beat

207).  Defendants allege that Byrd became concerned that Plaintiff was not acting

professionally towards minority citizens of the community and was not following protocol and,

therefore, assigned him to beats where he would have less interaction with minorities and be

subjected to closer supervision.

After July 20, 2009, Plaintiff worked for approximately four weeks when he went on

administrative leave.  Plaintiff remained on administrative leave from August 2009 through

December 2009.  By letter dated September 22, 2009, the Tompkins County District Attorney

wrote a letter to Defendant Chief Vallely stating, in part, that:

> The findings made in relation to the disciplinary proceeding into Officer Chris
> Miller's performance of certain duties has created a problem regarding his value as
> a witness in any pending or future hearings or trials.
>
> It is my opinion that Officer Miller's credibility with respect to the accuracy/veracity
> of his paperwork has been irreparably damaged.  I am unwilling to put him on the
> witness stand under any foreseeable circumstances owing to significant *Brady* and
> *Giglio* issues. . . .

Upon his return from administrative leave, Defendants placed Plaintiff on

permanent desk duty, purportedly because his value as a police officer had been

undermined by the letter from the District Attorney.

In the spring of 2010, Defendants learned that Plaintiff had previously been

employed as a police officer with the Vinton, Virginia police department.  In April 2010,

Defendant Deputy Chief Barber obtained a copy of Plaintiff's autobiography, previously

discussed *supra*, in which Plaintiff wrote that "no one would hire him in Virginia as a cop."  In May 2010, Defendants learned that Plaintiff was "terminated during his probationary period" from his position with the Vinton Police Department "for failure to perform up to standards of a police officer. . . ."  The letter from the Vinton Police Department listed various reasons supporting the termination, including: counseling for failure to follow written directives, failing to follow established procedures, and failing to follow verbal directions; failing to have a state inspection sticker on his personal vehicle; and his "admission to taking the sunglasses of a police officer and scratching "Im A Dick" on the lenses because he did not like the officer."

On May 20, 2010, Plaintiff commenced the instant litigation.  On May 26 or 27, Defendant Vallely asked Defendant Barber to draft a notice of discipline based on Plaintiff's falsification of his employment application and to seek the termination of Plaintiff's employment as the penalty.  In the early to mid afternoon of May 27, 2010, Barber sent to Vallely a draft notice of discipline seeking the termination of Plaintiff's employment.  Vallely made one final edit of the notice of discipline and otherwise approved the draft.  By 5:00 p.m., both Vallely and Barber had left work for the day.  At 5:30 p.m on May 27, 2010, Plaintiff served a copy of the Complaint in this lawsuit on the IPD.  The notice of discipline was served on Plaintiff on June 1, 2010.  Plaintiff demanded arbitration in connection with the notice of discipline, which is pending.  Plaintiff is receiving pay during the arbitration proceeding, which is still pending.

After various claims were dismissed via motions to dismiss and motions for summary judgment, this matter proceeded to trial.  After trial, the jury found against Plaintiff on his race based discrimination claim, but found in Plaintiff's favor on the retaliation claims.  Specifically, the jury found that Defendants Edward Vallely, John Barber, and Pete Tyler

retaliated against Plaintiff by issuing the June 1 notice of discipline.  The jury found that Defendant Byrd retaliated against Plaintiff by making certain beat assignments.  The jury found no liability as to Defendant Navarro.  The jury also imposed liability upon the City of Ithaca.  In awarding damages, the jury awarded $1.00 as against each of the individual Defendants (except Navarro) and $2,000,000 against the City of Ithaca, for a total award of $2,000,004.00.

Presently before the Court are Defendants' motions for judgment as a matter of law; to stay the judgment; for a new trial; and attorneys' fees; and Plaintiff's motions for attorneys' fees, costs, and for an altered judgment.

## II.      STANDARD OF REVIEW

### a.      Rule 50

The Court may set aside the jury's verdict pursuant to Rule 50 only where there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him.  Bucalo v. Shelter Island Union Free Sch. Dist., 691 F.3d 119, 127-28 (2d Cir. 2012); see also Materials Testing, Inc. v. Town of Babylon, 584 F.3d 436, 456 (2d Cir. 2009).  In reviewing such a motion, the Court must give deference to all credibility determinations and reasonable inferences of the jury, and may not weigh the credibility of witnesses or otherwise consider the weight of the evidence.  Id.

### b.      Rule 59

The standard under Rule 59 is less stringent than that under Rule 50.  Manley v. AmBase Corp., 337 F.3d 237, 244 (2d Cir. 2003).  The Court may order a new trial when it

concludes that the jury has reached a seriously erroneous result or the verdict is a

miscarriage of justice.  Id.  The Court must find the verdict as "against the weight of the

evidence."  Id. (quotations and citations omitted).  A motion for a new trial may be granted

even if there is substantial evidence supporting the jury's verdict.  In assessing whether to

grant a new trial, the Court may weigh the evidence, make credibility determinations, and

need not view the evidence in the light most favorable to the verdict.  Id; see also Martin v.

Moscowitz, 272 Fed. Appx. 44, 48 (2d Cir. 2008).

With these standards in mind, the Court will address the pending motion.

III.    **DISCUSSION**

a.        **Retaliation**

The jury returned a verdict in favor of Plaintiff on two retaliation claims: one with

respect to Plaintiff's beat assignments, and another with respect to the issuance of a notice

of discipline.  Defendants claim that there was an insufficient basis upon which the jury could

reasonably have concluded that Plaintiff suffered an adverse employment action on account

of having engaged in protected activity.

"Title VII contains an antiretaliation provision, which makes it unlawful for an

employer to discriminate against an employee for opposing any practice made unlawful by

Title VII."  Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 567 (2d Cir. 2011).

"Title VII thus prohibits an employer from taking 'materially adverse' action against an

employee because the employee opposed conduct that Title VII forbids or the employee

otherwise engaged in protected activity."  Id.  Not all employer conduct implicates Title VII.

Rather, Title VII "covers only an employer's actions that are 'materially adverse.'"  Id at 568;

see also Burlington Northern and Santa Fe Ry. Co. v. White, 126 S. Ct. 2405, 2414 (2006)

("The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm.").  Actions that are trivial are insufficient; rather, they must be the type of actions that might have dissuaded a reasonable worker from making or supporting a charge of discrimination.  Burlington Northern, 126 S. Ct. at 2415.

                  1.      Beat Assignments

Defendants move for judgment as a matter of law or, in the alternative, a new trial with respect to the beat assignments on the grounds that there was insufficient evidence that: (1) Defendant Byrd was aware of Plaintiff's discrimination complaints; (2) Plaintiff's beat assignments changed; and (3) the new beats constituted a materially adverse employment action.  For the following reasons, the Court finds that the jury reached a seriously erroneous result in concluding that the beat assignments were sufficiently adverse to be actionable.  Such a conclusion was against the weight of the evidence and warrants a new trial.

First, the period at issue here is limited to a period of approximately three or four weeks.  This is not a particularly long period of time.  Second, there was no evidence that the beat assignments affected Plaintiff's pay, tenure, benefits, seniority, overtime opportunities, or any other significant terms or conditions of his employment.  Third, the Collegetown beat was not an undesirable beat.  The undisputed testimony was that it was a car (as opposed to walking) beat, that it was typically less onerous than other beats, and that did not impose any additional hardships or burdens than other beats.  Plaintiff testified that some officers preferred this beat.  Thus, there was insufficient evidence at trial from which it reasonably can be concluded that the assignment to the Collegetown beat was likely to dissuade a reasonable person from complaining of, or supporting, a charge of discrimination.

Fourth, Plaintiff was assigned to the Commons beat only a handful of times over a three to four week period.  Fifth, although the Commons was a walking beat, the evidence at trial demonstrated that the duties of this beat were substantially similar to those of other beats.  Plaintiff had previously been assigned to other walking beats.  Aside from personal preferences of the officers, looking at the beat from an objective standpoint, nothing about the Commons beat suggests it was sufficiently undesirable to dissuade a reasonable person from complaining of, or supporting, a charge of discrimination.  The evidence demonstrates that other officers were routinely assigned to the Commons without any suggestion of retaliation.  Moreover, Plaintiff volunteered to cover the Commons beat to help another officer and also volunteered to cover the Commons on overtime beats.  In addition, Plaintiff testified at trial that some officers preferred the Commons beat.[7]  While there was some evidence that the Commons beat was less desired by some officers (including Plaintiff), the inquiry is an objective one.  Comparing the various beats, the Court finds that the weight of the evidence demonstrates that the assignment to the Collegetown and/or Commons beats were, at most, trivial annoyances and an insufficient employment action to support a claim of retaliation.  See Semsroth v. City of Wichita, 304 Fed. Appx. 707, 720 (10th Cir. 2008) (a change in beat assignment can be sufficiently adverse where it is not a beat assignment that any other officer wants, is referred to as the "banishment beat," provides diminished opportunities to gain experience and advance one's career, provides fewer overtime opportunities, and is typically assigned to new officers or officers who are being disciplined).

---

[7] Plaintiff and another officer also testified that the Commons beat was used for rookies and punishment.

Accordingly, Defendants' motion for a new trial is GRANTED with respect to the beat assignments.[8]

## 2.   Notice of Discipline

Defendants also move for a directed verdict or a new trial with respect to the issuance of the notice of discipline on the grounds that: (1) there was no adverse action against Plaintiff for years after he filed his first complaint of discrimination in December 2005, thereby detracting from any finding of retaliatory motive; (2) several months after Plaintiff filed a charge of discrimination in July 2008, he was nominated for the officer of the month award; (3) the notice of discipline was issued one year after Plaintiff filed the 2008 charge of discrimination; (4) the process of seeking Plaintiff's termination began in May 2010 when Chief Vallely learned that Plaintiff had not disclosed his prior employment as a police officer; and (5) the May 7, 2010 meeting provides an insufficient basis upon which to prove that the notice of discipline was issued in retaliation for engaging in protected conduct.  Plaintiff responds that there was ample evidence upon which to find retaliation, including: (1) the temporal proximity between the July 2009 charge of discrimination and the July 2010 notice of discipline; (2) other intervening events could have given raise to retaliatory animus, including Defendant's February 2010 receipt of a right to sue letter in connection with his August 2008 complaint of discrimination; and (3) the taped May 7, 2010 meeting wherein Defendant Tyler states, among other things, that "Chris, if you want to really open up a can of worms, that some of the stuff, that you, uh, actually most if not all of the stuff you're alleging

---

[8] With respect to Defendants' Rule 50 motion, looking at the evidence in the light most favorable to Plaintiff, it cannot be said that a finding that: (1) Byrd was aware of Plaintiff's history of complaints of discrimination, see Pl.'s Mem. of Law (Dkt. No. 516) at 5 (citing to the Transcript); (2) Plaintiff's beats changed, id. at p.3 (citing to the Transcript); or (3) the Commons beat was undesirable, id. at 7, was the product of sheer speculation or surmise.  Accordingly, judgment as a matter of law is not warranted.

about me in the Human Rights Complaints are completely and utter lies" and Defendants complained of the many personnel problems Plaintiff was alleged to be causing.

For the reasons stated in the Court's June 1, 2012 Decision and Order denying Defendants' motion for summary judgment, which need not be restated here, the Court finds that neither judgment as a matter of law nor a new trial is warranted on this claim. Although there was not a close temporal proximity between Plaintiff's filing of a charge of discrimination and the issuance of the notice of discipline, and there are legitimate, non-discriminatory reasons for the issuance of the notice of discipline, considering the totality of the evidence and, in particular, the statements made at the May 7 meeting, a jury could reasonably have concluded that the statements in Plaintiff's charges of discrimination were a motivating factor in Defendants' decision to issue the notice of discipline. Accordingly, Defendants' motions in this regard are DENIED.

**b.        Damages - Effect of New Trial**

The granting, in part, of Defendants' Rule 59 motion necessarily implicates the issue of damages. This is because the jury was asked to provide one amount of damages with respect to all three of Plaintiff's claims. The jury was not asked to separate out damages for each claim. While the Court has granted Defendants' motion for a new trial in connection with the beat assignments claim, it is unable to ascertain from the jury's verdict what portion of the damages are attributable to the notice of discipline claim. The issue concerning the beat assignments occurred starting in July 2009, approximately one year before the issuance of the notice of discipline. Although Plaintiff went on administrative leave as of August 2009, it cannot be said that in making its award the jury did not consider harm Plaintiff may have suffered as a result of his beat assignments from the period of July 2009

through the date of verdict and, possibly, going forward.  Accordingly, the Court finds that the

damages must be vacated and the matter set for a new trial on the issue of non-economic

compensatory damages.

      **c.**        **Damages - Amount of the Jury's Award**

Defendants also contend that the damages awarded by the jury are excessive as a

matter of law.  The Court agrees with Defendants that the award of $2,000,000, which is

based solely on non-economic loss, is patently excessive and shocks the conscience.  It has

been stated that "[w]hile it is properly within the province of the jury to calculate damages,

there is an upper limit, and whether that has been surpassed in not a question of fact with

respect to which reasonable persons may differ, but a question of law."  MacMillan v.

Millenium Broadway Hotel, — F. Supp.2d —, —, 2012 WL 2105832, at *9 (S.D.N.Y. 2012)

(internal quotations, citations and alterations omitted); see also Dagnello v. Long Island R.R.

Co., 289 F.2d 797, 806 (2d Cir. 1961).  "If a district court finds that a verdict is excessive, it

may order a new trial, a new trial limited to damages, or, under the practice of remittitur, may

condition a denial of a motion for a new trial on the plaintiff's accepting damages in a

reduced amount."  Tingley Sys., Inc. v. Norse Sys., Inc., 49 F.3d 93, 96 (2d Cir. 1995).  In

determining whether an award is so high that it shocks the conscience, courts look to

amounts awarded on comparable cases.  MacMillan, at *9  Id.  A court must then consider

whether the jury's award is within a reasonable range.  Id.

Courts have grouped emotional distress awards into three categories:

"garden variety," "significant," and "egregious."  Id. at *10.  Here, there was testimony

concerning emotional injury Plaintiff sustained as a result of Defendants' actions.  This

included testimony by Plaintiff, his spouse, his counselor, and his friends and co-workers.

There was evidence that Plaintiff suffered from post traumatic stress disorder and required medication.  This evidence can reasonably put this case into a category greater than "garden variety."  That being said, this case does not fall into the "egregious" category.  Any evidence of retaliatory motive was thin at best.  The number and instances of retaliation (even including the beat assignments) were few and occurred over a relatively short period of time. Moreover, as will be discussed in connection with Plaintiff's motion to alter judgment, it is more likely than not that Defendants would have issued the notice of termination regardless of Plaintiff's protected conduct.  Some portion of Plaintiff's emotional injuries reasonably occurred in connection with being issued a notice of discipline irrespective of whether it was motivated in part by retaliation.  Significantly, upon consideration of the weight of the evidence at trial on the issue of damages and the credibility of Plaintiff's and Defendants' witnesses, the Court finds that the evidence concerning the extent of any mental anguish was marginal and plainly insufficient to substantiate a verdict of $2,000,000 or anything remotely close thereto.  The verdict was far outside the range of reasonableness.  See Lore v. City of Syracuse, 670 F.3d 127, 179 (2d Cir. 2012) ("the amount of the $250,000 award with respect to the retaliatory events of September - November 2000 strikes us as generous. . . ."); Lee v. City of Syracuse, 446 Fed. Appx. 319 (2d Cir. 2011) (unreported) ($400,000 not excessive for numerous acts of retaliation of varying degrees of severity over a period of several years causing intense emotional distress); Phillips v. Bowern, 278 F.3d 103, 110-12 (2d Cir. 2002) (upholding $400,000 verdict in light of evidence of ongoing harassment over a five year period); Rosioreanu v. City of New York, 2012 WL 2792893, at *11; Farb v. Baldwin Union Free Sch. Dist., 2011 WL 4465051 (E.D.N.Y. 2011) (reducing $4 million compensatory damages award to $500,000); Menghi v. Hart, 745 F. Supp.2d 89, 108 (E.D.N.Y. 2010)

("courts in this Circuit have routinely found that awards randing from $100,000 to $500,000 are not excessive for significant emotional distress.") (internal quotations and citation omitted) (and cases cited therein); <u>Mendez v. Starwood Hotels & Resorts Woldwide, Inc.</u>, 746 F. Supp.2d 575 (reducing $1,000,000 compensatory damages award to $10,000); <u>MacMillan</u>, — F. Supp.2d at — (noting that garden variety cases generally merit $30,000 to $125,000 awards).  Accordingly, the jury's award of damages cannot stand and a new trial on damages is warranted.  <u>See</u> <u>McGrory v. City of New York</u>, 2004 WL 2290898, at *16 (S.D.N.Y. 2004).

### d.      Whether the Verdict Is Inherently Inconsistent

Defendants next ask for a new trial on the ground that verdict is inconsistent.  The basis for this argument is that the jury awarded only $1.00 as against each of the individual Defendants, but awarded $2,000,000 against the City.  Defendants argue that it is impossible for the jury to have found that none of the individual Defendants caused actual damage, but that the City did when the City could only act through its employees.  Because the Court has already granted a new trial on the beat assignment claims and damages, this issue is moot.

### e.      Trial Errors

#### 1.      Admission of the DHR Complaints

Defendants next move for a new trial on the ground that the Court committed various errors during the trial.  Defendants claim that the Court improperly allowed much of the substance of Plaintiff's lengthy Division of Human Rights ("DHR") complaints into evidence, which "allowed the jury to draw the inference that the allegations were not entirely without merit."  Defendants further argue that they were prevented from informing the jury that two of Plaintiff's DHR complaints were found to have no probable cause, which would

have allowed them to testify that "they had no concerns about Plaintiff's DHR claims at the time they issued the June 1, 2012, N.O.D., because they knew that the IPD had prevailed on the first two."  The Court rejects these claims, as it did during the trial, because: (1) the jury was instructed that the documents were not to be considered for their truth; and (2) the mere fact that the DHR may have issued a finding of no probable cause does not necessarily mean that Plaintiff's filing of those complaints did not form a basis of Defendants' decision to issue the notice of discipline.

Defendants next argue that the Court improperly allowed hearsay testimony concerning various incidents alleged in Plaintiff's DHR charges.  The Court agrees with Plaintiff that this testimony was relevant to whether Plaintiff's DHR charges included matters of public concern (his First Amendment claim).  Moreover, these matters were admitted not for the truth of the matters asserted, but to establish state of mind.

> 2.     Failure to Instruct Jury Concerning the Effect of "After Acquired Evidence"

Defendants contend that the Court erroneously failed to instruct the jury that damages should have been limited and/or precluded based upon after acquired evidence concerning Plaintiff's employment history in Vinton, Virginia.  Because the Court has already granted a new trial on damages, this issue is moot.

> 3.     Failure to Give a Present Value Charge

Defendants next claim that the Court failed to instruct the jury that it should reduce any future damages award to present value.  Because the Court has granted the motion for a new trial on damages, this issue is moot.

    4.      Failure to Permit Testimony from Defendants' Proposed Witnesses Andy McElwee, Joseph Palanza, and Gary Mills

Defendants claim they should be entitled to a new trial because the Court erroneously excluded the testimony of Andy McElwee, Joseph Palanza, and Gary Mills. The Court disagrees. Andy McElwee would have testified concerning the circumstances under which District Attorney Wilkinson wrote the September 22, 2009 letter stating that she could not use Plaintiff as a witness in any criminal trials. Defendants claim that McElwee would have testified that he requested Plaintiff's records and commenced the investigation into Plaintiff that led to Wilkinson's letter. This testimony would have been cumulative of evidence already in the record.

Defendants would have called Joseph Palanza to testify that he was encouraged by Plaintiff to file a false claim against his employer which could then later be used to "set up" a retaliation claim. Defendants claim that this testimony would have demonstrated that the instant case, too, was a "set up." This testimony was irrelevant. Although it appears that the entire case before the Court may have been planned by Plaintiff, it is irrelevant to the ultimate question of whether Defendants retaliated against Plaintiff for engaging in protected conduct. Whether Plaintiff acted with good or bad intentions, retaliation is prohibited by Title VII.

Lastly, Defendants claim they would have called Gary Mills concerning Plaintiff's employment at, and termination from, Cargill. This testimony would have been cumulative and, therefore, was properly excluded.

**f.      Whether Plaintiff Unlawfully Used a Peremptory Strike to Exclude the Only Non-White Juror in the Jury Pool**

Defendants next claim that Plaintiff improperly precluded the only non-white juror in the jury pool which was instrumental to his theory that the City of Ithaca treated minorities better than white males.  Although Plaintiff did strike the only non-white juror, the Court listened to Plaintiff's explanation for the exercise of that strike and did not believe that it was exercised for improper reasons.  Defendants have not identified any basis upon which to disturb that finding.

**g.      Plaintiff's Motion to Alter Judgment**

Plaintiff moves to alter the judgment to include equitable relief in the form of back pay, reinstatement, front pay, and directing Defendants to withdraw the June 1, 2010 notice of discipline.

Under the after-acquired evidence doctrine, "[o]nce an employer learns about employee wrongdoing that would lead to a legitimate discharge, we cannot require the employer to ignore the information, even if it is acquired during the course of discovery in a suit against the employer and even if the information might have gone undiscovered absent the suit."  McKennon v. Nashville Banner Pub. Co., 513 U.S. 352, 362, 115 S. Ct. 879, 886 (1995).  "Where an employer seeks to rely upon after-acquired evidence of wrongdoing, it must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge."  Id. at 362-63.

The Court finds that the evidence at trial adequately established that Plaintiff intentionally omitted past instances of employment from his application with the Ithaca City

Police Department.  The omission with respect to his prior employment with the Vinton Police Department was particularly egregious in light of the fact that he was terminated during his probationary period for failure to perform up to the standards of a police officer.  The evidence demonstrated that Plaintiff engaged in a series of conduct at Vinton and with Cargill that was inappropriate for a law enforcement officer, including failing to follow written directives, failing to follow established procedures, failing to follow verbal directions, and damaging the personal property of another officer.  Coupled with other instances of insubordination at the Ithaca Police Department, the falsification of documents (the DWI log), and a determination by the District Attorney that Plaintiff no longer had any value as a prosecution witness, the Court finds that Plaintiff engaged in sufficient misconduct such that Plaintiff would have been issued a notice of termination regardless of any retaliatory motive.  Because the date of Plaintiff's suspension coincides with the discovery of the after acquired evidence there is no basis for backpay.

This same reasoning applies to Plaintiff's application for front pay, reinstatement, and an order directing withdrawal of the notice of discipline.  Contrary to Plaintiff's argument, the jury did not make a determination that the issuance of notice of discipline was without any proper foundation or otherwise rejected Defendants' explanation for the issuance of the notice of discipline.  Rather, the jury's inquiry was limited to whether retaliation was **a** motivating factor.  See Gordon v. New York City Bd. of Ed., 232 F.3d 111, 117 (2d Cir. 2000); Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993) ("Title VII . . . is violated when a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause.  In addition, Title VII is violated when an employer is motivated by retaliatory animus, even if valid objective reasons for the discharge

exist."). The jury's verdict did not foreclose the possibility that there also were legitimate reasons for issuing the notice of discipline. See DeCintio v. Westchester County Medical Center, 821 F.2d 111, 115 n.8 ("In the event . . . that appellees were motivated by retaliatory animus in instituting the Section 75 proceeding, Title VII would be violated even though there were objectively valid grounds for the proceeding and the resulting discharge."). The Court finds that Defendants would have issued the notice of termination regardless of any retaliatory motive and, therefore, an award of back pay, front pay, or other equitable relief is not warranted.

> h.  **Attorneys' Fees**

Both sides move for an award of attorneys' fees. Because "the most critical factor [in awarding attorneys' fees] is the degree of success obtained," and the Court has granted the motion for a new trial law with respect to the beat-related retaliation claim and non-economic damages and denied the motion for back pay, front pay and equitable relief, the Court finds that a ruling on the issue of attorneys' fees is premature at this time. Accordingly, the motions are denied without prejudice to refiling upon the completion of a new trial or any appeal affecting the degree of success obtained.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' motion for judgment as a matter of law is DENIED. Defendants' motion for a new trial is GRANTED insofar as there shall be a new trial on the retaliation claim with respect to the beat assignments and on the issue of non-economic damages with respect to both retaliation claims. In all other respects, Defendants' motion for a new trial is DENIED. Plaintiff's motion for an altered judgment is DENIED. The

parties' motions for attorneys fees are DENIED WITHOUT PREJUDICE to refiling after a new trial.

IT IS SO ORDERED.

Dated: December 21, 2012

Thomas J. McAvoy
Senior, U.S. District Judge